1        MIDDLE DISTRICT OF LOUISIANA

2

3    ERYON LUKE

4    VERSUS                    CIVIL ACTION NO.
                               3:13-CV-402
5    CPLACE FOREST PARK SNF,

6    LLC

7

8        The deposition of MICHAEL BOLIGNY, taken in

9    connections with the captioned cause, pursuant to

10   the following stipulations before KRISTIE GARRISON,

11   Certified Court Reporter, at the offices of The

12   Kullman Firm, 4605 Bluebonnet Boulevard, Suite A,

13   Baton Rouge, Louisiana on the 14th day of September,

14   2015, beginning at 9:03 a.m.

15

16

17

18

19

20

21

22

23

24

25

1    APPEARANCES:

2

3    FOR THE PLAINTIFF, ERYON LUKE

4

5         VICTOR J. WOODS, JR
          THE WOODS LAW FIRM
6         3834 New Prosperity Lane
          Suite A
7         Addis, Louisiana  70710

8

     FOR THE DEFENDANT, CPLACE FOREST PARK SNF, LLC

9

10        CHRISTINE S. KEENAN
          THE KULLMAN FIRM
11        4605 Bluebonnet Boulveard
          Suite A
12        Baton Rouge, Louisiana  70809

13

14

15

16

17

18

19

20

21

22

23

24

25

1          E X A M I N A T I O N   I N D E X

2

3                                              PAGE

4

5

6     MR. WOODS                                  5

7

8

9

10

11              E X H I B I T    I N D E X

12

13     No Exhibits

14

15

16

17

18

19

20

21

22

23

24

25

1                    S T I P U L A T I O N

2

3          It is hereby stipulated by and among counsel

4     for plaintiff and counsel for defense that the

5     deposition of

6                     MICHAEL BOLIGNY

7     be taken before KRISTIE GARRISON, Certified Court

8     Reporter, by counsel for the plaintiff for all

9     purposes, pursuant to notice and to the provisions

10    of the appropriate statutes of the Code of Civil

11    Procedure of the State of Louisiana.

12         The parties hereto waive all formalities in

13    connection with the taking of said deposition,

14    including the reading and signing thereof, except

15    the swearing of the witness and the reduction of the

16    questions and answers to typewriting.

17         Per Article 1443(D) of the Louisiana Code of

18    Civil Procedure, counsel for all parties reserve all

19    objections until trial or other use of the

20    deposition.

21

22

23

24

25

```
1                      MICHAEL BOLIGNY,
2      after being first duly sworn by the above-mentioned
3      court reporter, did testify as follows:
4
5                          EXAMINATION
6      BY MR. WOODS:
7          Q.    Sir, my name is Victor Woods, and I
8      represent Eryon Luke.
9                Can you give us your full name, please?
10         A.    My name is Michael Jeremy Boligny.
11         Q.    And your address?
12         A.    3825 Webb Drive, Baton Rouge, Louisiana,
13     70805.
14         Q.    And the telephone number?
15         A.    (225) 907-3825.
16         Q.    And if we need to get in contact with
17     you, but are unable to do it at your job or your
18     address, is there another contact person or address
19     that may be available?
20         A.    No.
21         Q.    As I said, my name is Victor Woods and
22     I'm here representing Eryon Luke.
23               Have you ever done a deposition before?
24         A.    Never.
25         Q.    A deposition is you are giving testimony
```

1   under an oath just like you are in court.  Anything

2   that I say that you don't understand, please let me

3   know.  I'm not here to trick you.  We want to know

4   the accurate and correct information.  Do you

5   understand that?

6           If you answer my question, I'm going to

7   assume that you understand, correct?

8       A.   Correct.

9       Q.   And if you don't, please let me know.

10      A.   I will.

11      Q.   Are you known by any other names?

12      A.   That's the only one I've had since birth.

13      Q.   How long have you been living at your

14   current address?

15      A.   Since 1998.

16      Q.   Where are you currently employed?

17      A.   Yes.

18      Q.   Where?

19      A.   Where?  Baton Rouge General Midcity and

20   also at that time it was called Sherwood Manor.

21      Q.   Where are you employed at now?

22      A.   Those same two places, which is renamed

23   to Nottingham.

24      Q.   What do you do at the Baton Rouge

25   General?

1    A.    I am a shift leader, shift supervisor,

2  and I work in a role of PCA, status of three.

3    Q.    What is a PCA?

4    A.    Patient Care Associate.

5    Q.    What do you do for Sherwood Manor?

6    A.    Well, it's Nottingham now.  I'm a shift

7  supervisor for the 2:00 to 10:00 shift.

8    Q.    As shift supervisor are you working in

9  the same capacity as you do at Baton Rouge General

10  or in some other capacity?  I know you are a

11  supervisor, but I'm talking about your actual job.

12    A.    Oh, yes, same thing.  I make sure things

13  get done.  I worked the floor there when needed when

14  we are short.  I work the floor at Nottingham when

15  we are short.

16    Q.    Have you had any conversations with

17  anybody regarding this litigation itself, not what

18  you talked, but have you had any conversations

19  regarding this litigation prior to today?

20    A.    Yes.

21    Q.    Who would those conversations have been

22  with?

23    A.    That was Rachel Carcamo, Head of Human

24  Resources.  She contacted me the first time that I

25  would be receiving a phone call from someone

1 regarding this.

2  Q. And she told you that you would be

3 receiving a call, but did you all talk about what

4 the case was about?

5  A. No.

6  Q. Did you talk to anybody about today?

7  A. No.

8  Q. Are you represented by an attorney?

9  A. No.

10  Q. You said that you are employed at

11 Sherwood Manor, now known as Nottingham.  Is it your

12 understanding that that's who your corporate

13 employer is?  Do you have any idea of any other name

14 of who employs you?

15  A. No.  They've changed the name several

16 times.

17  Q. Do you know anything about those name

18 changes?

19  A. No.

20  Q. Do you know about the corporate or

21 business structure of Sherwood Manor or Nottingham?

22  A. Rephrase that please.

23  Q. Do you know anything about who owns those

24 businesses or who owned them previously?

25  A. I can't remember.  I know who the active

1   person is now.

2       Q.    Who is that active person?

3       A.    I don't know his last.  They just call

4   him R.B.  I don't know who that is.

5       Q.    Bridges?

6       A.    I don't know his last name.

7       Q.    And you've told me that, but I just want

8   to make sure.

9             How long have you been employed with

10  Sherwood Manor/Nottingham?

11      A.    Since August 27, 2001, the day of

12  opening.

13      Q.    When it first opened, it was known as

14  Sherwood Manor?

15      A.    Yes.

16      Q.    In what capacity were you first employed?

17      A.    As a supervisor.

18      Q.    Has that position or your

19  responsibilities changed or had they been the same?

20      A.    The same.

21      Q.    Tell me specifically what are your job

22  duties.

23      A.    My job duties are to keep up with the

24  time, the staff, everybody is in place, all care is

25  done professionally, attitudes are in check when it

1   comes to taking care of patients there, and

2   everything has to be done.  I have to make sure that

3   everyone is in place when I get there, they come to

4   work on time, their supplies are in place.  If they

5   don't, they come to me.  If they need help with

6   someone, I'm available for that.  Meals are done

7   right.  Patients are literally taken care from.

8       Q.    Do you do any on-hand work or are you

9   just mainly responsible supervising those

10  individuals under you?

11      A.    That job entails me to do anything that's

12  necessary.  If I have to work -- like I said

13  earlier, if I have to work the floor because we are

14  short, I'm available for that too.  Keep the shift

15  going.

16      Q.    How many people do you supervise on a

17  shift?

18      A.    Currently?

19      Q.    Yes.

20      A.    11 to 12.

21      Q.    Has that number changed over the years?

22      A.    It was greater.  It used to be greater.

23      Q.    How many would you supervise?

24      A.    About 13 to 14.

25      Q.    What is the job description or name of

1    the job of the individuals of who you supervise?
2    Not specifically what their names are, but their
3    title.
4         A.    CNAs.
5         Q.    What is the responsibility of a CNA?
6         A.    The responsibility of a CNA of his or her
7    work day is:  One, to be to work on time.  Two, to
8    be in uniform according to the policy of the
9    facility.  To come and make sure their supplies for
10   the shift are gathered.  They have adequate
11   supplies.  If they don't have them, they come to me.
12   I find them and provide them with what they need.
13   If they have it, I make sure they have it.  If they
14   don't have it, I may have to call out and get it,
15   but I do get it.
16         They will come in and make rounds on the
17   residents to make sure from the previous shift that
18   they are not left in a mess like heavily wet,
19   soiled, bed torn up, hanging out the bed, having
20   been up in the chair all day from the previous
21   shift -- left them up in the chair, put them back to
22   take care of them, and make rounds often.  We
23   require at least two hours to make rounds to every
24   resident in that building.
25         If they have to get up for evening meal,

1    you know, to get up.  If they don't have help, they

2    can ask a team partner, another CNA or even myself.

3    I make myself available for that too.  So assess the

4    situation to see if I think and they think it is too

5    big or greater job to do.  I have an input to make

6    sure it's done right.

7         Q.    Is anybody on the property there to help

8    the CNAs other than other CNAs?

9         A.    Oh, yes, the whole facility.  The nurses

10   are responsible as well as I am.

11        Q.    Is there something called a PCA?

12        A.    Not there.

13        Q.    What is a PCA?

14        A.    Patient Care Associate.

15        Q.    Do you know the difference between a PCA

16   and a CNA?

17        A.    Yes, I do.

18        Q.    What is the difference?

19        A.    A CNA does what I just told you.  A PCA

20   may do a little bit more.  Being a PCA, myself, at

21   the Baton Rouge I'm responsible for vital signs,

22   they do them there.  Accu check, they don't them at

23   Nottingham.  They don't chart.  They chart at

24   kiosks.  They don't chart in detail.

25        Q.    Would it be fair to say a PCA has more

1   responsibilities than a CNA or less responsibilities

2   than a CNA?

3       A.    PCA has more responsibilities.

4       Q.    What is the responsibility of the CNA

5   specifically to a patient when it comes to movement

6   and assisting them physically?

7       A.    To go and assess them.  If they think

8   they can't do it, they have to ask for help.  It's a

9   team effort there.

10      Q.    Is part of that responsibility lifting

11  and moving?

12      A.    Yes, it is.

13      Q.    Are there any lifting equipment or any

14  type of equipment at Nottingham that would assist a

15  CNA in moving or lifting or transferring a patient?

16      A.    Yes.

17      Q.    What type of equipment is that?

18      A.    That would be called a Hoyer lift,

19  H-O-Y-E-R.

20      Q.    Is there one at Nottingham?

21      A.    There are four.

22      Q.    Have they been there during your entire

23  tenure?

24      A.    No.

25      Q.    Do you know when they received the Hoyer

1    lifts?

2       A.    I'm going to say within two years ago.

3       Q.    You know we are here in reference to

4    Eryon Luke, correct?

5       A.    Correct.

6       Q.    Were the Hoyer lifts there when she was

7    an employee?

8       A.    No.

9       Q.    Were there any types of lifts there when

10   she was an employee?

11      A.    No.

12      Q.    Explain to me what are Hoyer lifts?

13      A.    A Hoyer lift is a lift -- well, when we

14   have a patient who has injuries or have ailments

15   that you just can't pick them up like you normally

16   do no matter how many you have, it's a greater

17   security method that we use and a greater feature

18   that we use to get them up.  We roll them from side

19   to side, log roll them in bed to get them up from

20   side to side.  We lift them with a mechanical lift

21   that goes over head and has like two bars here and

22   there.  Hook, hook, hook, hook.  Press the button

23   and it mechanizes it, lifts them up, puts them to

24   the chair.  We have to stand back and adjust them in

25   the chair.  As it's going down, it puts them in

1   place and it's a safety measure for the resident as

2   well as the employee.

3       Q.    Does the Hoyer lift take one employee or

4   more employees to operate?

5       A.    The policy states that we have to have

6   two people present using that lift at all times.

7   You get no one up without two people present.

8       Q.    You say that -- did they receive all

9   these Hoyer lifts at the same time?

10      A.    No.  They had like three and had

11  something wrong with it and send it back.  They were

12  replaced the same day they came to pick the other

13  one up.

14      Q.    I guess what I'm asking is:  Was the

15  policy instituted to use these Hoyer lifts occurred

16  and all four were purchased at the same time or were

17  they purchased at different times?

18      A.    They came back a couple days apart.  The

19  company brought one and brought the next two the

20  next day.

21      Q.    Are you certain that none of these lifts

22  were there when Eryon Luke was an employee?

23      A.    Yes, I am very certain.  I know they

24  weren't there.

25      Q.    What method was used to move or lift an

1    employee prior to these lifts being present?

2        A.    You mean to move a patient, not an

3    employee?

4        Q.    I'm sorry.  Correct.  A patient.

5        A.    Teamwork, three to four people, maybe

6    more.

7        Q.    Was this done on a consistent basis?

8        A.    Very consistent.

9        Q.    Isn't it in fact the policy of Nottingham

10   that if necessary there should be teamwork in moving

11   patients if it's deemed that it is too much for one

12   person to handle?

13       A.    Oh, yes.  They are not going to pick up

14   anybody by themselves.

15       Q.    Is there certain criteria that you all

16   are informed of or a policy to help you determine

17   when there should be assistance?

18       A.    You are going to determine that when you

19   make your assessment.

20       Q.    Is that assessment made by the CNA?

21       A.    By the CNA and it is past on by a report.

22       Q.    I know transferring a patient is a big

23   duty of a CNA and lifting.  Is there any other

24   situation where a CNA would be required to move or

25   lift a patient?

1      A.    Solo?

2      Q.    For any purpose.

3      A.    Oh, yes.  If someone falls on the floor,

4  you got to pick them up.  That is a team effort too.

5      Q.    Any other incident that you could tell

6  me?

7      A.    No.  Get them out of bed, put them back

8  to bed.  If they fall on the floor, we have to get

9  them up.

10     Q.    Now that you all have the lifts, how

11  often is that done by an individual solely to

12  transfer a patient from a bed to a chair?

13     A.    It's not by an individual.  It's a policy

14  in place.  It's been in place since we got them.  We

15  were in-serviced on it.  Everyone that comes in,

16  even the new employees, are in-serviced.  There has

17  to be two persons present at the usage of that lift.

18     Q.    And prior to these lifts, you said it

19  would be up to CNA doing an assessment to see if a

20  patient could be moved solely by themselves,

21  correct?

22     A.    Correct.

23     Q.    Is there some type of team or someone

24  designated on a shift to help a person move an

25  individual or it was just whoever was available?

1      A.      Right.  Whoever can help.

2      Q.      Tell me, who is your immediate

3  supervisor?

4      A.      My immediate supervisor is Tonja Hayes,

5  RN, Director of Nursing.

6      Q.      Did you know a Rachel Carcamo?

7      A.      I knew her.

8      Q.      How did you know her?

9      A.      She worked there.

10      Q.      You know what position?

11      A.      HR Director.

12      Q.      Did you have any direct contact with her?

13      A.      Every day.

14      Q.      Would your contact deal specifically with

15  employees or what was the nature of your contact

16  with her?

17      A.      Personal things like my vacation time and

18  stuff like that that was submitted.  People would

19  come to me -- employees would say their time is not

20  right.  I would refer back to paperwork that I had

21  to prove that person was right or wrong.

22      Q.      Would she be involved in the

23  decision-making and determination of employees?

24      A.      In the decision-making?

25      Q.      Decision-making in hiring and firing.

1     A.     Not hiring, but firing.

2     Q.     Did you happen to know a person by the

3 name Donna Duplantis?

4     A.     Donna, no.  I don't know who that is.

5     Q.     Did you know who Rachel Carcamo had to

6 answer to or who was her supervisor?

7     A.     Whoever the owner was, I guess.

8     Q.     You think she reported directly to the

9 owner?

10     A.     I don't know.

11     Q.     I'm just asking what was your

12 understanding.

13     A.     I don't know who she had to answer to.  I

14 would say directly at that time, it may have been

15 the administrator.  There are chains of command to

16 go through.

17     Q.     It is your testimony -- did you know who

18 that administrator was?

19     A.     I knew who all the administrators were.

20     Q.     Who would have been the administrator

21 that she would have had to answer to?

22     A.     By name?

23     Q.     Yes.

24     A.     Based on this case?

25     Q.     Yes.

1      A.    I can't think.  I don't know.  I know the

2  names of them, but I don't know the timeframe.

3      Q.    Just tell me the names of those that you

4  do remember.

5      A.    Robert Ray, Stephen Acklin, Candace

6  Gautreaux, president Michelle Peterson.  I think

7  Barbara Vanlieux was an administrator once too.

8      Q.    Were these people that were on site at

9  Nottingham or were they on some other site?

10     A.    On site.

11     Q.    Did these people hold various

12  administrative positions or did they hold the same

13  administrative positions at different times?

14     A.    At different times.

15     Q.    But it was the administrator over the

16  facility?

17     A.    The facility.

18     Q.    Not to put words in you mouth, but it

19  would have been something like a manager or

20  president over Nottingham.  How would you classify

21  it?

22     A.    I would say president over Nottingham.

23     Q.    Do you remember an employee named Eryon

24  Luke?

25     A.    I do.

1    Q.    What was her position?

2    A.    She was a CNA hired for the 2:00 to 10:00

3  shift.

4    Q.    Was that the same time period that you

5  worked?

6    A.    Oh, yes, same shift.

7    Q.    Did you review any information about her

8  employment prior to coming here today?

9    A.    No.

10    Q.    Any statements, any notes, her file?

11    A.    No.

12    Q.    At some point in time you were made aware

13  that she was pregnant, correct?

14    A.    Right.

15    Q.    How did you come about to find that

16  information?

17    A.    She told everybody in the building.

18    Q.    When you say she told everyone in the

19  building, what do mean by that?

20    A.    She told everybody I'm pregnant, I'm

21  pregnant.

22    Q.    What was your reason -- did you believe

23  there was an ulterior motive for that?  Did you

24  believe she was happy?  The way you said it it seems

25  like you have a belief that there was some purpose

1   behind that.

2       A.    No.   She just told everybody she was

3   pregnant.

4       Q.    Did she inform you that she was pregnant?

5       A.    She did not.

6       Q.    Do you know if she ever informed anyone

7   in administration that she was pregnant?

8       A.    She may have told Rachel.   I'm not

9   certain.   She would have had to have told Rachel

10  Carcamo.

11      Q.    And at some point in time there were some

12  restrictions on her job regarding her employment.

13  Were you aware of that?

14      A.    Yes.   That is when I found out she was

15  pregnant.   She told Rachel that.

16      Q.    Did you have any direct conversation with

17  Rachel Carcamo -- let's just say Rachel.   I don't

18  know the correct pronunciation -- regarding Ms.

19  Luke's pregnancy.

20      A.    Yes.

21      Q.    What was the nature of those

22  conversations?

23      A.    Work status -- her work restriction

24  status.

25      Q.    What about the work restrictions?

1    A.    How it came to me is coming to work at 2

2    o'clock in the day time.  The assignment is

3    previously made before I get there and those notes

4    are made at the bottom of the assignment.  It tells

5    you what status everybody is working, the area they

6    are working, the responsibility of working.  At the

7    bottom it is indicated of what this person is going

8    to be doing.  It is a little note at the bottom of

9    the assignment.

10         I remember it saying that Eryon was going

11   to have light duty.  I went to Rachel and asked her

12   what does light duty entail and why.

13   Q.    Let's stop.  You said there are notes.

14   Who prepared those notes?

15   A.    The supervisor previous to me coming.

16   Q.    Who would that have been?

17   A.    I can't remember back then.  It's been so

18   many.

19   Q.    So it would have been the supervisor on

20   the shift prior to you who prepared the notes?

21   A.    The assignment was made before I got

22   there.

23   Q.    And you said you went to Rachel on that

24   day that you saw that?

25   A.    Yes.

1      Q.     What did you and Rachel discussed?

2      A.     That she was pregnant.  She was on my

3  duty and what her restrictions would be for what she

4  could do and what she couldn't do.

5      Q.     Did you have an issue with that?

6      A.     No, I followed the assignment.

7      Q.     Were you able to give her direction and

8  to comply with her light duty status and assigning

9  her appropriate jobs to do?

10     A.     Who are you speaking of?  Ms. Luke?

11     Q.     Yes.

12     A.     Yes.

13     Q.     And she was able to fulfill her

14  obligations that you assigned her on that day?

15     A.     That day, yes and no.

16     Q.     Explain to me "yes and no."

17     A.     She had duties of passing ice, answering

18  the calls and getting things that she could do.  It

19  didn't have a weight restriction, but that wasn't

20  posted nor was it told to me the amount of pounds

21  that she could do.  She could pass ice, pass snacks.

22  The next couple of days it was upgraded to answer

23  the lights on the hall.  She wasn't supposed to do

24  anything, but to answer the lights.  Keep up with

25  call lights.

1    Q.    Can I stop you?  You said it was

2    upgraded.  It was upgraded by whom?

3    A.    I don't know.  It was just on the

4    assignment.

5    Q.    It was on the assignment sheet?

6    A.    It was one that should have been on the

7    assignment sheet.

8    Q.    So it is your testimony that you didn't

9    make a decision to put her on light duty based upon

10   anything that she presented you.  Someone else made

11   that decision and you were carrying it out?

12   A.    Right.

13   Q.    As far as you know, you carried it out

14   because it was listed on these assignment sheets

15   that you had received?

16   A.    Previous to me coming to work.

17   Q.    And the assignment sheets that you

18   received were from the supervisor who was on the

19   previous shift?

20   A.    Correct.

21   Q.    So I'm assuming that you prepared the

22   assignment sheet to pass on to the next person?  I'm

23   a little bit confused.

24   A.    The day-shift supervisor was the overall

25   supervisor.  They made those assignments for all

1    three shifts.

2        Q.    So the overall supervisor would have been

3    your supervisor also?

4        A.    Right.

5        Q.    And, again, do you remember who was the

6    overall supervisor?

7        A.    Let me see, it's been so many.  It may

8    have been Dina Oliver.  Who was before that?  I

9    think before that it was Sharon Kelly.

10       Q.    Do you know if it was said in

11   conversation how they were informed to assign her to

12   light duty work?

13       A.    No.

14       Q.    But there was sufficient work for her to

15   do?

16       A.    Oh, yes.

17       Q.    At some point in time she was removed

18   from light duty status, correct?

19       A.    I'm not familiar with that.

20       Q.    Are you familiar with why she stopped

21   working?

22       A.    No, I was just told that she was off and

23   about two weeks later she came back to work.  I just

24   assumed she was off the schedule.

25       Q.    So you weren't consulted about anything

1    regarding her employment?

2        A.    Meaning?

3        Q.    Meaning, did anyone ask you any questions

4    about whether there was light duty, was there

5    sufficient work for her to do?  Did anybody talk to

6    you about the work that she was able to perform?

7        A.    No, I followed it to the letter each day.

8    That didn't change.  It said she could answer the

9    lights -- she was passing ice.  She could answer the

10   lights.

11       Q.    But at any point in time -- I'm sorry.  I

12   cut you off.  Go ahead?

13       A.    That's it.  I'm finished.

14       Q.    At any point in time, do you remember

15   anyone coming to talk to you as her direct

16   supervisor about work that she was able to do or not

17   do?

18       A.    I'm not certain.  I know Rachel said a

19   couple of times that she was on light duty.  She did

20   say she was on light duty.  And I never questioned

21   it.

22       Q.    Did you ever question it?

23       A.    I never questioned it.  They said she was

24   on light duty and what she could do, that was it.

25       Q.    Did Rachel ever question you about the

1    light duty work that she was doing?

2        A.    No.

3        Q.    Was it your decision to remove her from

4    your shift?

5        A.    No, it was not.

6        Q.    Did you ever request that she be placed

7    on FMLA?

8        A.    She didn't discuss that with me.  No.

9        Q.    Did Rachel or anybody ever discuss with

10   you about her and the needs for her to be placed on

11   FMLA status?

12       A.    No.

13       Q.    Do you know what FMLA status is when I

14   say it?

15       A.    Family Medical Leave.

16       Q.    Did they ever tell you that she was being

17   placed on FMLA leave?

18       A.    No.

19       Q.    Did you have any idea as to why she was

20   not working there anymore?

21       A.    No.

22       Q.    Were you her direct supervisor the entire

23   time?

24       A.    Yes.

25       Q.    I have a Louisiana Work Commission form

1  that was sent to Eryon Luke.  It says, (reading):
2  You have not been disqualified.  See the reverse
3  side section.
4          You were discharged from your employment
5  because of absenteeism due to personal illness,
6  medical reasons.  You properly notified your
7  employer supervisor.  There is no misconduct
8  connected with the employment.
9          And that is something that Ms. Luke
10  received.  I just wanted you to hear what it said.
11          I also have a form -- do you know Rachel
12  Carcamo's signature?
13     A.    No.
14     Q.    I have a form here that appears as though
15  it was signed by Rachel Carcamo.  It says (reading):
16  Ms. Luke was discharged.  Fired and said failed to
17  return from leave of absence.  FMLA exhausted.
18          And you saying that Rachel Carcamo -- was
19  she your supervisor, maybe not your direct
20  supervisor, but was she your supervisor that you
21  were under?
22     A.    No.
23     Q.    She was not your supervisor in any kind
24  of way?
25     A.    She was the Human Resources Director.

1    Q.    She was the Human Resources Director, but

2    it would be fair to say that she knows why a person

3    is no longer employed at a place, correct?

4    A.    Yes.

5    Q.    I'm telling you, you don't know this.  We

6    also took Rachel Carcamo's deposition and I

7    questioned Ms. Carcamo and said (reading):  So the

8    soul reason for her termination was based upon the

9    fact that she had exhausted all of her leave.

10         I'm telling you, I'm not saying you have

11   to accept this, but her answer to me was "Yes."

12   That's on page 23 of her deposition.

13         On page 56 of her deposition I also ask

14   her (reading):  As you sit here today, you say that

15   the only reason she was terminated is because she

16   ran out of time?

17         And her answer was "correct."  We were

18   talking about Ms. Luke in those cases.

19         Did you understand what was the basis

20   that Rachel Carcamo said that she left employment?

21   A.    Never discussed that with me.

22   Q.    I know you didn't discuss it, but based

23   upon what I read and said here today, do you

24   understand why Ms. Carcamo said that she left

25   employment?  Because she ran out of time, because of

```
1   absenteeism?
2        A.    No, I do not understand that.
3        Q.    That is fine.
4              Based upon what I'm telling you, do you
5   have any reasons as you sit here to disagree with
6   what Rachel Carcamo said is the reason for her
7   leaving employment?
8        A.    No.
9        Q.    Rachel Carcamo would be the person who is
10  in the best position to state why she left
11  employment than you, correct?
12       A.    Right.
13       Q.    And you could not disagree with anything
14  that she said, correct?
15       A.    Correct.
16       Q.    And it wasn't your decision in any way or
17  fashion or form that Ms. Luke be forced to leave
18  employment, be requested to leave employment, or
19  take leave?  Did you have anything to do with that?
20       A.    No, I did not.
21       Q.    When you were employed, did you receive
22  any type of training manual or resource manual from
23  your employer?
24       A.    At Nottingham?
25       Q.    Yes.
```

1       A.      Yes.

2       Q.      Do you remember when you first received

3   that?

4       A.      14 years ago.

5       Q.      Did you ever receive an update?

6       A.      No.

7       Q.      I think there was one that we had that is

8   dated November 2011.  Do you remember if you've ever

9   received a copy of that one?  It said "Revised

10  Employee Manual."

11      A.      No.

12      Q.      You only received the original one at the

13  time --

14      A.      The whole building got one.

15      Q.      Is there anything else that you feel that

16  you need to tell me regarding this case?

17      A.      No.  Is there anything else you want to

18  ask me?

19      Q.      Give me a second just to make sure.

20              Are you familiar with a name of a

21  facility that goes by the name of Amber Terrace?

22      A.      Uh-huh.

23              MS. KEENAN:

24                  For the record that was a no.

25              MR. WOODS:

1               Okay.  I think that's all I have.

2     Thank you.

3          MS. KEENAN:

4               I have no questions.

5          COURT REPORTER:

6               Ms. Keenan, would you like a copy?

7          MS. KEENAN:

8               Yes, please.

9

10

11

12          (Deposition concluded at 9:36 a.m.)

13

14

15

16

17

18

19

20

21

22

23

24

25

1          REPORTER'S CERTIFICATE

2          This certification is valid only for a
transcript accompanied by my original signature and
3  original required seal on this certificate.

4          I, KRISTIE GARRISON, Certified Court
Reporter, in and for the State of Louisiana, as the
5  officer before whom this testimony was taken, do
hereby certify that MICHAEL BOLIGNY, after having
6  been duly sworn by me upon authority of R.S.
37:2554, did testify on the 14th day of September
7  2015, at Baton Rouge, Louisiana, as hereinbefore set
forth in the foregoing 33 pages;

8

9          That this testimony was reported by me in
the voice writing reporting method, was prepared and
transcribed by me or under my personal direction and
10  supervision, and is true and correct to the best of
my ability and understanding;

11

12          That the transcript has been prepared in
compliance with the transcript format guidelines
required by statute and by rules of the board;

13

14          That I have acted in compliance with the
prohibition on contractual relationships, as defined
by Louisiana Code of Civil Procedure Article 1434
15  and rules and of the board;

16          That I am not related to counsel or to any
of the parties hereto, I am in no manner associated
17  with counsel for any of the interested parties to
this litigation, and I am in no way concerned with
18  the outcome thereof.

19          September 18, 2015, Baton Rouge, Louisiana.

20

21

22

23  _____
KRISTIE GARRISON, CCR
CERTIFIED COURT REPORTER
24

25

**A**

a.m 1:14 33:12
ability 34:10
able 24:7,13 27:6
   27:16
above-mentioned
   5:2
absence 29:17
absenteeism 29:5
   31:1
accept 30:11
accompanied
   34:2
Accu 12:22
accurate 6:4
Acklin 20:5
acted 34:13
ACTION 1:4
active 8:25 9:2
actual 7:11
Addis 2:7
address 5:11,18
   5:18 6:14
adequate 11:10
adjust 14:24
administration
   22:7
administrative
   20:12,13
administrator
   19:15,18,20
   20:7,15
administrators
   19:19
ago 14:2 32:4
ahead 27:12
ailments 14:14
Amber 32:21
amount 24:20
answer 6:6 19:6
   19:13,21 24:22
   24:24 27:8,9
   30:11,17
answering 24:17
answers 4:16
anybody 7:17 8:6
   12:7 16:14 27:5
   28:9
anymore 28:20
apart 15:18
APPEARANCES

2:1
appears 29:14
appropriate 4:10
   24:9
area 23:5
Article 4:17 34:14
asked 23:11
asking 15:14
   19:11
assess 12:3 13:7
assessment 16:19
   16:20 17:19
assign 26:11
assigned 24:14
assigning 24:8
assignment 23:2,4
   23:9,21 24:6
   25:4,5,7,14,17
   25:22
assignments
   25:25
assist 13:14
assistance 16:17
assisting 13:6
Associate 7:4
   12:14
associated 34:16
assume 6:7
assumed 26:24
assuming 25:21
attitudes 9:25
attorney 8:8
August 9:11
authority 34:6
available 5:19
   10:6,14 12:3
   17:25
aware 21:12
   22:13

**B**

B 3:11
back 11:21 14:24
   15:11,18 17:7
   18:20 23:17
   26:23
Barbara 20:7
bars 14:21
based 19:24 25:9
   30:8,22 31:4
basis 16:7 30:19
Baton 1:13 2:12

5:12 6:19,24 7:9
   12:21 34:7,19
bed 11:19,19
   14:19 17:7,8,12
beginning 1:14
belief 21:25
believe 21:22,24
best 31:10 34:10
big 12:5 16:22
birth 6:12
bit 12:20 25:23
Bluebonnet 1:12
   2:11
board 34:12,15
Boligny 1:8 4:6
   5:1,10 34:5
bottom 23:4,7,8
Boulevard 1:12
Bouleveard 2:11
Bridges 9:5
brought 15:19,19
building 11:24
   21:17,19 32:14
business 8:21
businesses 8:24
button 14:22

**C**

call 7:25 8:3 9:3
   11:14 24:25
called 6:20 12:11
   13:18
calls 24:18
Candace 20:5
capacity 7:9,10
   9:16
captioned 1:9
Carcamo 7:23
   18:6 19:5 22:10
   22:17 29:15,18
   30:7,20,24 31:6
   31:9
Carcamo's 29:12
   30:6
care 7:4 9:24 10:1
   10:7 11:22
   12:14
carried 25:13
carrying 25:11
case 8:4 19:24
   32:16
cases 30:18

cause 1:9
CCR 34:23
certain 15:21,23
   16:15 22:9
   27:18
certificate 34:1,3
certification 34:2
Certified 1:11 4:7
   34:4,23
certify 34:5
chains 19:15
chair 11:20,21
   14:24,25 17:12
change 27:8
changed 8:15
   9:19 10:21
changes 8:18
chart 12:23,23,24
check 9:25 12:22
CHRISTINE
   2:10
Civil 1:4 4:10,18
   34:14
classify 20:20
CNA 11:5,6 12:2
   12:16,19 13:1,2
   13:4,15 16:20
   16:21,23,24
   17:19 21:2
CNAs 11:4 12:8,8
Code 4:10,17
   34:14
come 10:3,5 11:9
   11:11,16 18:19
   21:15
comes 10:1 13:5
   17:15
coming 21:8 23:1
   23:15 25:16
   27:15
command 19:15
Commission
   28:25
company 15:19
compliance 34:12
   34:13
comply 24:8
concerned 34:17
concluded 33:12
confused 25:23
connected 29:8
connection 4:13

connections 1:9
consistent 16:7,8
consulted 26:25
contact 5:16,18
   16:1,3
contacted 7:24
contractual 34:14
conversation
   22:16 26:11
conversations
   7:16,18,21
   22:22
copy 32:9 33:6
corporate 8:12,20
correct 6:4,7,8
   14:4,5 16:4
   17:21,22 21:13
   22:18 25:20
   26:18 30:3,17
   31:11,14,15
   34:10
counsel 4:3,4,8,18
   34:16,17
couple 15:18
   24:22 27:19
court 1:11 4:7 5:3
   6:1 33:5 34:4,23
CPLACE 1:5 2:8
criteria 16:15
current 6:14
currently 6:16
   10:18
cut 27:12

**D**

D 3:1,11
dated 32:8
day 1:13 9:11
   11:7,20 15:12
   15:20 18:13
   23:2,24 24:14
   24:15 27:7 34:6
day-shift 25:24
days 15:18 24:22
deal 18:14
decision 25:9,11
   28:3 31:16
decision-making
   18:23,24,25
deemed 16:11
DEFENDANT
   2:8

defense 4:4
defined 34:14
deposition 1:8 4:5
  4:13,20 5:23,25
  30:6,12,13
  33:12
description 10:25
designated 17:24
detail 12:24
determination
  18:23
determine 16:16
  16:18
difference 12:15
  12:18
different 15:17
  20:13,14
Dina 26:8
direct 18:12 22:16
  27:15 28:22
  29:19
direction 24:7
  34:9
directly 19:8,14
Director 18:5,11
  29:25 30:1
disagree 31:5,13
discharged 29:4
  29:16
discuss 28:8,9
  30:22
discussed 24:1
  30:21
disqualified 29:2
DISTRICT 1:1
doing 17:19 23:8
  28:1
Donna 19:3,4
Drive 5:12
due 29:5
duly 5:2 34:6
Duplantis 19:3
duties 9:22,23
  24:17
duty 16:23 23:11
  23:12 24:3,8
  25:9 26:12,18
  27:4,19,20,24
  28:1

E
E 3:1,1,11,11

earlier 10:13
effort 13:9 17:4
employed 6:16,21
  8:10 9:9,16 30:3
  31:21
employee 14:7,10
  15:2,3,22 16:1,3
  20:23 32:10
employees 15:4
  17:16 18:15,19
  18:23
employer 8:13
  29:7 31:23
employment 21:8
  22:12 27:1 29:4
  29:8 30:20,25
  31:7,11,18,18
employs 8:14
entail 23:12
entails 10:11
entire 13:22 28:22
equipment 13:13
  13:14,17
Eryon 1:3 2:3 5:8
  5:22 14:4 15:22
  20:23 23:10
  29:1
evening 11:25
everybody 9:24
  21:17,20 22:2
  23:5
EXAMINATION
  5:5
exhausted 29:17
  30:9
Exhibits 3:13
Explain 14:12
  24:16

F
facility 11:9 12:9
  20:16,17 32:21
fact 16:9 30:9
failed 29:16
fair 12:25 30:2
fall 17:8
falls 17:3
familiar 26:19,20
  32:20
Family 28:15
far 25:13
fashion 31:17

feature 14:17
feel 32:15
file 21:10
find 11:12 21:15
fine 31:3
finished 27:13
Fired 29:16
firing 18:25 19:1
Firm 1:12 2:5,10
first 5:2 7:24 9:13
  9:16 32:2
floor 7:13,14
  10:13 17:3,8
FMLA 28:7,11,13
  28:17 29:17
followed 24:6
  27:7
following 1:10
follows 5:3
forced 31:17
foregoing 34:7
FOREST 1:5 2:8
form 28:25 29:11
  29:14 31:17
formalities 4:12
format 34:12
forth 34:7
found 22:14
four 13:21 15:16
  16:5
fulfill 24:13
full 5:9

G
GARRISON 1:10
  4:7 34:4,23
gathered 11:10
Gautreaux 20:6
General 6:19,25
  7:9
getting 24:18
give 5:9 24:7
  32:19
giving 5:25
go 13:7 19:16
  27:12
goes 14:21 32:21
going 6:6 10:15
  14:2,25 16:13
  16:18 23:7,10
greater 10:22,22
  12:5 14:16,17

guess 15:14 19:7
guidelines 34:12

H
H 3:11
H-O-Y-E-R 13:19
hall 24:23
handle 16:12
hanging 11:19
happen 19:2
happy 21:24
Hayes 18:4
head 7:23 14:21
hear 29:10
heavily 11:18
help 10:5 12:1,7
  13:8 16:16
  17:24 18:1
hereinbefore 34:7
hereto 4:12 34:16
hired 21:2
hiring 18:25 19:1
hold 20:11,12
hook 14:22,22,22
  14:22
hours 11:23
Hoyer 13:18,25
  14:6,12,13 15:3
  15:9,15
HR 18:11
Human 7:23
  29:25 30:1

I
ice 24:17,21 27:9
idea 8:13 28:19
illness 29:5
immediate 18:2,4
in-serviced 17:15
  17:16
incident 17:5
including 4:14
indicated 23:7
individual 17:11
  17:13,25
individuals 10:10
  11:1
inform 22:4
information 6:4
  21:7,16
informed 16:16
  22:6 26:11

injuries 14:14
input 12:5
instituted 15:15
interested 34:17
involved 18:22
issue 24:5

J
J 2:5
Jeremy 5:10
job 5:17 7:11 9:21
  9:23 10:11,25
  11:1 12:5 22:12
jobs 24:9
JR 2:5

K
Keenan 2:10
  32:23 33:3,6,7
keep 9:23 10:14
  24:24
Kelly 26:9
kind 29:23
kiosks 12:24
knew 18:7 19:19
know 6:3,3,9 7:10
  8:17,20,23,25
  9:3,4,6 12:1,15
  13:25 14:3
  15:23 16:22
  18:6,8,10 19:2,4
  19:5,10,13,17
  20:1,1,2 22:6,18
  25:3,13 26:10
  27:18 28:13
  29:11 30:5,22
known 6:11 8:11
  9:13
knows 30:2
KRISTIE 1:10
  4:7 34:4,23
Kullman 1:12
  2:10

L
L 4:1
Lane 2:6
LAW 2:5
leader 7:1
leave 28:15,17
  29:17 30:9
  31:17,18,19

leaving 31:7
left 11:18,21
  30:20,24 31:10
let's 22:17 23:13
letter 27:7
lift 13:18 14:13,13
  14:20,20 15:3,6
  15:25 16:25
  17:17
lifting 13:10,13,15
  16:23
lifts 14:1,6,9,12
  14:23 15:9,15
  15:21 16:1
  17:10,18
light 23:11,12
  24:8 25:9 26:12
  26:18 27:4,19
  27:20,24 28:1
lights 24:23,24,25
  27:9,10
listed 25:14
literally 10:7
litigation 7:17,19
  34:17
little 12:20 23:8
  25:23
living 6:13
LLC 1:6 2:8
log 14:19
long 6:13 9:9
longer 30:3
Louisiana 1:1,13
  2:7,12 4:11,17
  5:12 28:25 34:4
  34:7,14,19
Luke 1:3 2:3 5:8
  5:22 14:4 15:22
  20:24 24:10
  29:1,9,16 30:18
  31:17
Luke's 22:19

**M**

M 3:1
manager 20:19
manner 34:16
Manor 6:20 7:5
  8:11,21 9:14
Manor/Notting...
  9:10
manual 31:22,22

32:10
matter 14:16
meal 11:25
Meals 10:6
mean 16:2 21:19
Meaning 27:2,3
measure 15:1
mechanical 14:20
mechanizes 14:23
medical 28:15
  29:6
mess 11:18
method 14:17
  15:25 34:9
Michael 1:8 4:6
  5:1,10 34:5
Michelle 20:6
Midcity 6:19
MIDDLE 1:1
misconduct 29:7
motive 21:23
mouth 20:18
move 15:25 16:2
  16:24 17:24
moved 17:20
movement 13:5
moving 13:11,15
  16:10

**N**

N 3:1,1,1,11 4:1
name 5:7,9,10,21
  8:13,15,17 9:6
  10:25 19:3,22
  32:20,21
named 20:23
names 6:11 11:2
  20:2,3
nature 18:15
  22:21
necessary 10:12
  16:10
need 5:16 10:5
  11:12 32:16
needed 7:13
needs 28:10
never 5:24 27:20
  27:23 30:21
new 2:6 17:16
normally 14:15
note 23:8
notes 21:10 23:3

23:13,14,20
notice 4:9
notified 29:6
Nottingham 6:23
  7:6,14 8:11,21
  12:23 13:14,20
  16:9 20:9,20,22
  31:24
November 32:8
number 5:14
  10:21
nurses 12:9
Nursing 18:5

**O**

O 3:1 4:1
o'clock 23:2
oath 6:1
objections 4:19
obligations 24:14
occurred 15:15
officer 34:5
offices 1:11
Oh 7:12 12:9
  16:13 17:3 21:6
  26:16
Okay 33:1
Oliver 26:8
on-hand 10:8
once 20:7
opened 9:13
opening 9:12
operate 15:4
original 32:12
  34:2,3
outcome 34:18
overall 25:24 26:2
  26:6
owned 8:24
owner 19:7,9
owns 8:23

**P**

P 4:1
page 3:3 30:12,13
pages 34:7
paperwork 18:20
PARK 1:5 2:8
part 13:10
parties 4:12,18
  34:16,17
partner 12:2

pass 24:21,21
  25:22
passing 24:17
  27:9
patient 7:4 12:14
  13:5,15 14:14
  16:2,4,22,25
  17:12,20
patients 10:1,7
  16:11
PCA 7:2,3 12:11
  12:13,15,19,20
  12:25 13:3
people 10:16 15:6
  15:7 16:5 18:18
  20:8,11
perform 27:6
period 21:4
person 5:18 9:1,2
  16:12 17:24
  18:21 19:2 23:7
  25:22 30:2 31:9
personal 18:17
  29:5 34:9
persons 17:17
Peterson 20:6
phone 7:25
physically 13:6
pick 14:15 15:12
  16:13 17:4
place 9:24 10:3,4
  15:1 17:14,14
  30:3
placed 28:6,10,17
places 6:22
plaintiff 2:3 4:4,8
please 5:9 6:2,9
  8:22 33:8
point 21:12 22:11
  26:17 27:11,14
policy 11:8 15:5
  15:15 16:9,16
  17:13
position 9:18
  18:10 21:1
  31:10
positions 20:12,13
posted 24:20
pounds 24:20
pregnancy 22:19
pregnant 21:13
  21:20,21 22:3,4

22:7,15 24:2
prepared 23:14
  23:20 25:21
  34:9,11
present 15:6,7
  16:1 17:17
presented 25:10
president 20:6,20
  20:22
Press 14:22
previous 11:17,20
  23:15 25:16,19
previously 8:24
  23:3
prior 7:19 16:1
  17:18 21:8
  23:20
Procedure 4:11
  4:18 34:14
professionally
  9:25
prohibition 34:14
pronunciation
  22:18
properly 29:6
property 12:7
Prosperity 2:6
prove 18:21
provide 11:12
provisions 4:9
purchased 15:16
  15:17
purpose 17:2
  21:25
purposes 4:9
pursuant 1:9 4:9
put 11:21 17:7
  20:18 25:9
puts 14:23,25

**Q**

question 6:6
  27:22,25
questioned 27:20
  27:23 30:7
questions 4:16
  27:3 33:4

**R**

R.B 9:4
R.S 34:6
Rachel 7:23 18:6

19:5 22:8,9,15
22:17,17 23:11
23:23 24:1
27:18,25 28:9
29:11,15,18
30:6,20 31:6,9
**ran** 30:16,25
**Ray** 20:5
**read** 30:23
**reading** 4:14 29:1
29:15 30:7,14
**reason** 21:22 30:8
30:15 31:6
**reasons** 29:6 31:5
**receive** 15:8 31:21
32:5
**received** 13:25
25:15,18 29:10
32:2,9,12
**receiving** 7:25 8:3
**record** 32:24
**reduction** 4:15
**refer** 18:20
**reference** 14:3
**regarding** 7:17,19
8:1 22:12,18
27:1 32:16
**related** 34:16
**relationships**
34:14
**remember** 8:25
20:4,23 23:10
23:17 26:5
27:14 32:2,8
**remove** 28:3
**removed** 26:17
**renamed** 6:22
**Rephrase** 8:22
**replaced** 15:12
**report** 16:21
**reported** 19:8
34:8
**reporter** 1:11 4:8
5:3 33:5 34:4,23
**REPORTER'S**
34:1
**reporting** 34:9
**represent** 5:8
**represented** 8:8
**representing** 5:22
**request** 28:6
**requested** 31:18

**require** 11:23
**required** 16:24
34:3,12
**reserve** 4:18
**resident** 11:24
15:1
**residents** 11:17
**resource** 31:22
**Resources** 7:24
29:25 30:1
**responsibilities**
9:19 13:1,1,3
**responsibility**
11:5,6 13:4,10
23:6
**responsible** 10:9
12:10,21
**restriction** 22:23
24:19
**restrictions** 22:12
22:25 24:3
**return** 29:17
**reverse** 29:2
**review** 21:7
**Revised** 32:9
**right** 10:7 12:6
18:1,20,21
21:14 25:12
26:4 31:12
**RN** 18:5
**Robert** 20:5
**role** 7:2
**roll** 14:18,19
**Rouge** 1:13 2:12
5:12 6:19,24 7:9
12:21 34:7,19
**rounds** 11:16,22
11:23
**rules** 34:12,15

_____
**S**
**S** 2:10 4:1
**safety** 15:1
**saw** 23:24
**saying** 23:10
29:18 30:10
**says** 29:1,15
**schedule** 26:24
**seal** 34:3
**second** 32:19
**section** 29:3
**security** 14:17

**see** 12:4 17:19
26:7 29:2
**send** 15:11
**sent** 29:1
**September** 1:13
34:6,19
**set** 34:7
**Sharon** 26:9
**sheet** 25:5,7,22
**sheets** 25:14,17
**Sherwood** 6:20
7:5 8:11,21 9:10
9:14
**shift** 7:1,1,6,7,8
10:14,17 11:10
11:17,21 17:24
21:3,6 23:20
25:19 28:4
**shifts** 26:1
**short** 7:14,15
10:14
**side** 14:18,19,20
14:20 29:3
**signature** 29:12
34:2
**signed** 29:15
**signing** 4:14
**signs** 12:21
**Sir** 5:7
**sit** 30:14 31:5
**site** 20:8,9,10
**situation** 12:4
16:24
**snacks** 24:21
**SNF** 1:5 2:8
**soiled** 11:19
**solely** 17:11,20
**Solo** 17:1
**sorry** 16:4 27:11
**soul** 30:8
**speaking** 24:10
**specifically** 9:21
11:2 13:5 18:14
**staff** 9:24
**stand** 14:24
**state** 4:11 31:10
34:4
**statements** 21:10
**states** 15:5
**status** 7:2 22:23
22:24 23:5 24:8
26:18 28:11,13

**statute** 34:12
**statutes** 4:10
**Stephen** 20:5
**stipulated** 4:3
**stipulations** 1:10
**stop** 23:13 25:1
**stopped** 26:20
**structure** 8:21
**stuff** 18:18
**submitted** 18:18
**sufficient** 26:14
27:5
**Suite** 1:12 2:6,11
**supervise** 10:16
10:23 11:1
**supervising** 10:9
**supervision** 34:10
**supervisor** 7:1,7,8
7:11 9:17 18:3,4
19:6 23:15,19
25:18,24,25
26:2,3,6 27:16
28:22 29:7,19
29:20,20,23
**supplies** 10:4 11:9
11:11
**supposed** 24:23
**sure** 7:12 9:8 10:2
11:9,13,17 12:6
32:19
**swearing** 4:15
**sworn** 5:2 34:6

_____
**T**
**T** 3:1,11 4:1,1
**take** 11:22 15:3
31:19
**taken** 1:8 4:7 10:7
34:5
**talk** 8:3,6 27:5,15
**talked** 7:18
**talking** 7:11 30:18
**team** 12:2 13:9
17:4,23
**teamwork** 16:5
16:10
**telephone** 5:14
**tell** 9:21 17:5 18:2
20:3 28:16
32:16
**telling** 30:5,10
31:4

**tells** 23:4
**tenure** 13:23
**terminated** 30:15
**termination** 30:8
**Terrace** 32:21
**testify** 5:3 34:6
**testimony** 5:25
19:17 25:8 34:5
34:8
**Thank** 33:2
**thereof** 4:14
34:18
**thing** 7:12
**things** 7:12 18:17
24:18
**think** 12:4,4 13:7
19:8 20:1,6 26:9
32:7 33:1
**three** 7:2 15:10
16:5 26:1
**time** 6:20 7:24
9:24 10:4 11:7
15:9,16 18:17
18:19 19:14
21:4,12 22:11
23:2 26:17
27:11,14 28:23
30:16,25 32:13
**timeframe** 20:2
**times** 8:16 15:6,17
20:13,14 27:19
**title** 11:3
**today** 7:19 8:6
21:8 30:14,23
**told** 8:2 9:7 12:19
21:17,18,20
22:2,8,9,15
24:20 26:22
**Tonja** 18:4
**torn** 11:19
**training** 31:22
**transcribed** 34:9
**transcript** 34:2,11
34:12
**transfer** 17:12
**transferring**
13:15 16:22
**trial** 4:19
**trick** 6:3
**true** 34:10
**two** 6:22 11:7,23
14:2,21 15:6,7

15:19 17:17
26:23
**type** 13:14,17
17:23 31:22
**types** 14:9
**typewriting** 4:16

___
**U**
___
**U** 4:1
**Uh-huh** 32:22
**ulterior** 21:23
**unable** 5:17
**understand** 6:2,5
6:7 30:19,24
31:2
**understanding**
8:12 19:12
34:10
**uniform** 11:8
**update** 32:5
**upgraded** 24:22
25:2,2
**usage** 17:17
**use** 4:19 14:17,18
15:15

___
**V**
___
**vacation** 18:17
**valid** 34:2
**Vanlieux** 20:7
**various** 20:11
**VERSUS** 1:4
**Victor** 2:5 5:7,21
**vital** 12:21
**voice** 34:9

___
**W**
___
**waive** 4:12
**want** 6:3 9:7
32:17
**wanted** 29:10
**wasn't** 24:19,23
31:16
**way** 21:24 29:24
31:16 34:17
**Webb** 5:12
**weeks** 26:23
**weight** 24:19
**went** 23:11,23
**weren't** 15:24
26:25
**wet** 11:18

**witness** 4:15
**Woods** 2:5,5 3:6
5:6,7,21 32:25
**words** 20:18
**work** 7:2,14 10:4
10:8,12,13 11:7
11:7 22:23,23
22:25 23:1
25:16 26:12,14
26:23 27:5,6,16
28:1,25
**worked** 7:13 18:9
21:5
**working** 7:8 23:5
23:6,6 26:21
28:20
**writing** 34:9
**wrong** 15:11
18:21

___
**X**
___
**X** 3:1,1,11,11

___
**Y**
___
**years** 10:21 14:2
32:4

___
**Z**
___

___
**0**
___

___
**1**
___
**10:00** 7:7 21:2
**11** 10:20
**12** 10:20
**13** 10:24
**14** 10:24 32:4
**1434** 34:14
**1443(D)** 4:17
**14th** 1:13 34:6
**18** 34:19
**1998** 6:15

___
**2**
___
**2** 23:1
**2:00** 7:7 21:2
**2001** 9:11
**2011** 32:8
**2015** 1:14 34:7,19
**225** 5:15
**23** 30:12
**27** 9:11

___
**3**
___
**3:13-CV-402** 1:4
**33** 34:7
**37:2554** 34:6
**3825** 5:12
**3834** 2:6

___
**4**
___
**4605** 1:12 2:11

___
**5**
___
**5** 3:6
**56** 30:13

___
**6**
___

___
**7**
___
**70710** 2:7
**70805** 5:13
**70809** 2:12

___
**8**
___

___
**9**
___
**9:03** 1:14
**9:36** 33:12
**907-3825** 5:15